## EQUITABLE MORTGAGE CORPORATION, Plaintiff,

v.

## MORTGAGE GUARANTY INSURANCE CORPORATION, Defendant Third Party Plaintiff,

v.

## Jack MANN, Third Party Defendant.

### Civ. A. No. S89–0538(G).

United States District Court, S.D. Mississippi, S.D.

Nov. 19, 1990.

---

John Harral, Gulfport, Miss., for plaintiff.

Donna Jacobs, Lawrence Franck, Robert M. Frey, Jackson, Miss., for defendant.

Richard A. Courtney, Jackson, Miss., for third party defendant.

## MEMORANDUM OPINION

GEX, District Judge.

The plaintiff, Equitable Mortgage Corporation [Equitable], brings this action for declaratory judgment to construe the rights of the parties under a certificate of insurance issued to the plaintiff by the defendant, Mortgage Guaranty Insurance Corporation [MGIC]. MGIC now moves for summary judgment on liability pursuant to Federal Rule of Civil Procedure 56, or, in the alternative, for partial summary judgment on the issue of punitive damages.

### Statement of Facts

In April 1985, Hancock Mortgage Company [Hancock] made a loan of $200,000 to Dr. Morton F. Longnecker for the refinancing of his home at 316 Lovers Lane, Ocean Springs, Mississippi. On conjunction with this loan, Hancock sought mortgage insurance coverage from MGIC. As part of the application package, Hancock submitted to MGIC an appraisal of the property located at 316 Lovers Lane. This appraisal, which was performed by Jack Mann, represented the value of the Longnecker house to be $250,000. Based on the information submitted, including Mann's appraisal, MGIC issued a certificate of insurance for 30% of the Longnecker loan, or $60,000.

The coverage of the Longnecker loan was provided pursuant to a Master Policy

existing between MGIC and Hancock. This Master Policy provides in part:

> The Insured agrees that statements made in matters presented by it, the Borrower, or any other party in any application for coverage under this Policy, and in the appraisal, the plans and specifications, and other exhibits and documents submitted therewith or at anytime thereafter are the Insured's representations, and that the company has issued the certificate in reliance on the correctness and completeness thereof.

The Master Policy excludes from coverage:

> Any claim involving or arising out of any dishonest, fraudulent, criminal, or knowingly wrongful act (including error or omission) by the Insured or the Servicer; or any claim involving or arising out of negligence of the Insured or the Servicer, which negligence is material either to the acceptance of the risk or to the hazard assumed by the Company.

Additionally, MGIC's underwriting policies curtail coverage in certain instances. The underwriting guidelines establish a maximum loan-to-value ratio [LTV] of 80% for an "equity refinancing" and 95% for a "term refinancing." In other words, coverage would be prohibited where the amount of the loan exceeds 80% or 95%, as the case may be, of the appraised value of the security.

Dr. Longnecker subsequently defaulted on the loan obligation to Hancock, and Hancock filed a claim for benefits under the Certificate of Insurance on August 31, 1987. During a review of the claim, it was discovered that the Mann appraisal, which was submitted by Hancock as part of the application for coverage, was incorrect in at least three respects: (1) lot size was overstated; (2) square footage was overstated; and (3) the value was overstated. Mann, in fact, admitted to Hancock that the appraisal misrepresented the value of the house. Based on accurate lot size and square footage figures, Mann reduced his appraised value to $225,000. At a value of $225,000, the LTV on the Longnecker loan exceeds 80%.

MGIC wrote to Hancock on March 14, 1988 regarding the results of its investigation and the discovery of the inaccurate information in the appraisal. By this same letter, Rick Calvelli, Senior Legal Counsel for MGIC, urged Hancock to provide any "contrary information" which would aid MGIC in making its final determination of the claim. No contrary evidence was forthcoming. On or about October 20, 1988, MGIC notified Hancock that it was rescinding its certificate of insurance covering the Longnecker loan. However, it was not until April 21, 1989, that MGIC tendered refund of the premium, without interest. The tender was refused by Hancock's successor, Equitable. Equitable brought suit on May 1, 1989 seeking reformation of the Certificate of Insurance and for compensatory and punitive damages.

### Conclusions of Law

■ A grant of summary judgment is appropriate when, viewed in the light most favorable to the nonmoving party "... the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact...." Fed.R.Civ.P. 56(c). The moving party initially carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality connotes disputes over facts which might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, "... summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

■ The issue here is "mutual mistake of fact." It is undisputed that both parties to the contract operated under the same misunderstanding. That is both parties believed the collateral to be worth more than it was. However, the parties diverge as to their theories of how the problem should be

corrected. Equitable argues that the solution is the remedy of reformation as opposed to the rescission in practice exercised by MGIC. Obviously, the remedies are fundamentally at odds, and the resolution of the instant motion depends upon the determination of the correct remedy to be applied to the situation at hand.

In opposition to the motion for summary judgment and, in essence, in support of its cause of action, Equitable argues that it is the office of the remedy of reformation to declare the status and obligations which the parties intended to create. 66 Am. Jur.2d *Reformation of Instruments*, § 5, p. 530 (1973). Further, Equitable states that it is not necessary, in order to establish a mistake in an instrument, that it be shown that particular words were agreed upon by the parties to be inserted in the instrument. However, it is sufficient to establish that the parties had agreed to accomplish a particular object and that the instrument executed was insufficient to effectuate their intention. 66 Am.Jur.2d *Reformation of Instruments*, § 13, p. 539 (1973). Accordingly, Equitable submits that the heart of the equitable relief of reformation is the intention of the parties, and further makes the following factual argument:

> If the parties reach an agreement which fairly expresses their intention, but in setting their agreement into writing fail to reflect their intentions, then the court may reform the written instrument to accurately reflect their intentions. E.A. Allen's affidavit demonstrates unequivocally that it was Equitable's intention in entering into the Master Policy that MGIC would insure loans made by Equitable where the creditor and the property satisfied the underwriting guidelines. MGIC routinely did just that. The Longnecker loan is no different from other loans insured by MGIC in that both the borrower and the property satisfied the underwriting guidelines. The amount of the loan, and therefore the amount of the insurance coverage, did not reflect the true intention of the parties due to the mistake made by Jack Mann, the appraiser, in using the incor-

rect square footage of the house. The evidence is uncontested that had Jack Mann not made a mistake as to the square footage of the house, he would have issued an appraisal of $225,000.00 and Equitable would have made a loan of $180,000.00. (Allen Affidavit, para. 7). The evidence is also uncontested that had Jack Mann not made that mistake, and had Equitable made a loan in the amount of $180,000.00, then MGIC would have issued insurance covering thirty percent (30%) of that loan, as it had routinely done for so many other loans made by Equitable and insured pursuant to the Master Policy between the parties. (Dearing deposition, pg. 80.)

For the reasons stated herein, the Court finds that the plaintiff's arguments are both factually and legally unpersuasive.

■■■ The Court finds that the proper remedy in the instant case is rescission rather than reformation. Mississippi courts apply the general law of contracts to insurance cases including the rules governing reformation. *Pride v. General Agents Insurance Co.*, 697 F.Supp. 1417, 1423 (N.D.Miss.1988). The general rule in Mississippi is that reformation is justified in only two instances: (1) where there is a mutual mistake of the parties; and (2) where there is a mistake on the part of one party and fraud or inequitable conduct on the part of the other. *Johnson v. Consolidated American Life Insurance Co.*, 244 So.2d 400, 402 (Miss.1971). A mistake which will justify reformation must be in the drafting of the instrument, not in the making of the contract. *Johnson*, 244 So.2d at 402; *accord Lititz Mutual Insurance Co. v. Miller*, 50 So.2d 221 (Miss. 1951). Equitable has not alleged any fraud on the part of MGIC in the making of the insurance contract. Rather, Equitable urges that the parties were victims of a mutual mistake in the value of the security. In other words, the mistake was in the making of the contract not in the drafting.

The plaintiff here urges the Court to rewrite the contract at issue rather than merely to reform a mistake in the drafting. The mistake here undermined the integrity

of the entire bargaining process. The reformation the plaintiff would have this Court undertake would necessitate this Court's evaluation of what the defendant would have done had the entire factual scenario been different. Commentators have explained the problem as follows:

> The purpose of an action for reformation of a written instrument, and the office or function of the remedy of reformation, is not to make a new agreement for the parties, but to establish and perpetuate the true existing one by making the instrument express the real intent of the parties. The court merely makes the instrument what the parties intended it to be. The court cannot rewrite the contract which the parties have made so as to express an agreement which they did not enter into. A court has no power to supply an agreement which was never made, or to alter or amend a contract which the parties themselves have understandingly made, for it is the province of courts to enforce contracts, not to make or alter them.

> The court in recognizing the equity of reformation cannot make such a contract as it thinks the parties ought to have made or would have made, if better informed. For reformation, it is not what the parties would have intended if they had known better, but what they did intend at the time, informed as they were, and it is not enough to justify reformation that the court is satisfied that the parties would have come to a certain agreement had they been aware of the actual facts. Relief is granted not for the purpose of relieving against a hard or oppressive bargain or to give either party a better one, but simply to enforce the agreement as it was made and to prevent an injustice which would ensue if this were not done. The mere fact that inflation causes a contract to become a poor bargain is not a ground for reformation. The office of the remedy is to declare the status and obligations which the parties intended to create, and on which such rights as they would have acquired under a correct instrument may be asserted and defended.

The court will look at the transaction and instrument as of the time when the instrument was executed in order to determine the intentions of the parties for the purpose of determining whether the instrument reflects the true agreement of the parties. A court should not, under the guise of reformation, write into a written agreement a term or provision which was not earlier agreed to by the parties themselves, and it will not insert in the instrument important terms or conditions which the parties never fully assented to. Neither will the court insert a provision which was omitted with the consent of the party asking the reformation, although such consent was given in reliance on an oral promise of the other party that the omission should not make any difference.

66 Am.Jur.2d *Reformation of Instruments*, § 5 pp. 530–32 (1973) footnotes omitted.

According to Equitable, "[t]he certificate of insurance should be reformed to reflect the true situation as it existed at the time the loan was made and to grant to the parties what each intended at the time the certificate was issued...." The true situation is that Hancock made a loan of $200,000 to Dr. Longnecker. Hancock applied to MGIC for mortgage insurance on a $200,000 loan. MGIC agreed to insure a $200,000 loan if the appraised value of the security was at least $250,000—if the loan-to-value ratio did not exceed 80%. This agreement is fully and accurately reflected in the certificate of insurance.

■ Equitable does not argue that there was some error or omission in the document so that it is variant with the parties' understanding. Equitable's argument is that had it known the "true" value of the security, Hancock would have loaned Dr. Longnecker some amount less than $200,000. Hancock then would have presented a different loan package to MGIC, and MGIC would have written a certificate for that particular loan. The only thing which would have been the same is the debtor's name. While a court may correct a writing which does not accurately reflect the par-

ties' agreement, that court has no power to make contracts for the parties to which they never agreed, or to substitute one contract for another. *Phoenix Fire Insurance Co. v. Hoffheimer Brothers*, 46 Miss. 645, 657 (1872).

If this Court were to accept Equitable's position on the reformation, it would be enforcing an agreement into which the parties never entered. The fact remains here that Equitable did not loan Dr. Longnecker the lower amount, and the fact remains the MGIC did not insure the lower amount. If this Court were to speculate that MGIC would have done so and enforced such a speculation, then an entirely new contract would exist at this Court's insistence. This is forbidden. This Court cannot reform the contract to express an agreement that would have been made had the parties "known better" or known the real facts. If this Court were to allow reformation here, it would basically become MGIC's underwriting department. For these reasons, this Court finds that the undisputed facts here do not justify reformation of the contract at issue.

Rather, the appropriate remedy is that of rescission for mutual mistake of fact. In *Greer v. Higgins*, 338 So.2d 1233 (Miss. 1976) the Mississippi Supreme Court set aside a conveyance of property due to a mutual mistake of fact on the part of both of the parties to the contract. There, the court stated:

> A mutual mistake [of fact] is one common to both parties to a contract, each laboring under the same misconception; more precisely, it is one common to both or all parties, wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement. The mistake may apply to the identity or existence of the subject matter; but in order to relieve a party from liability on the contract, the mistake must relate to a material fact, past or present.

*Greer*, 338 So.2d at 1236. There, the court found that such a mistake existed and set aside a deed. In the instant case, the mutual mistake goes directly to the formation of the agreement itself. Consequently, the proper remedy is rescission rather than reformation.

The plaintiff makes the argument that the defendant presented no evidence in support of its motion for summary judgment that the misrepresentation was material to its risk sufficient to support its rescission of the policy. In Mississippi, the law of rescission of an insurance contract is as United States District Judge Lee has stated:

> An insurance contract induced by misrepresentation or concealment of material fact ... may be avoided by the insurer if the misrepresentation or concealment is material to the risk of hazard assumed by the insurer.... [A] fact is material if a reasonably careful and intelligent underwriter would have regarded the fact misrepresented or concealed as substantially increasing the chance of loss insured against, so as to bring about a rejection of the risk or the charging of a higher premium.

*Stanley v. American Republic Insurance Co.*, No. JH7–0229(L) 1988 WL 284693 (S.D.Miss. June 7, 1988).

MGIC has, indeed, presented evidence that had it known of the true value of the security, it would have responded differently to the request for insurance either in a rejection or the charging of higher premiums. Kathy Dearing, manager of the quality control department of MGIC, explained in her deposition that when MGIC underwrites a loan, the underwriter looks at two things: (1) the borrower's ability to repay the debt and (2) the borrower's willingness to repay the debt, measured by his equity in the property. (Dearing Deposition, pp. 39–40). Thus, MGIC's underwriting guidelines and premium rates are based upon the combined loans-to-value, or the borrower's true equity. As a borrower's equity position is reduced, MGIC's risk increases. (Dearing Deposition, pp. 61, 82). Consequently, this Court finds the evidence undisputed concerning the materiality of the

misrepresentation contained in the appraisal to the risk assumed by MGIC.

■ The plaintiff has submitted the affidavit of their expert witness on finance, Kenneth Eugene Lehrer. He opined that the mistake by the appraiser which resulted in the increased LTV did not materially increase MGIC's risk in issuing the certificate of insurance to Equitable. In support thereof, Lehrer cites the credit information submitted by Dr. Longnecker in connection with the loan. Particularly, the expert focused only upon Longnecker's income. However, the expert did not take into account Longnecker's apparent indebtedness in relation to the loan and the LTV. The evidence of record indicates that the property in question was already encumbered by liens totalling approximately $185,000. Regardless of the amount of the loan from Equitable, there would have been at least $185,000 in debt secured by the Longnecker residence. Dearing stated:

> [R]eduction [of the amount of the loan] in this case wouldn't have been significant ... you can reduce the loan down to $100,000 but there were still liens on the property out there in excess of that $100,000, so that would not have made any difference on this particular loan.

(Dearing Deposition, p. 107). Additionally, the expert failed to take into account MGIC's underwriting guidelines. The evidence clearly reveals that the lower value of the home increased the LTV. The evidence also proves that even had Equitable loaned the lower amount of $180,000, the LTV would have been more than 82%. The evidence is also undisputed that this higher LTV violated the underwriting policies adopted by MGIC. The underwriting guidelines were clear, and it is evident from the record that Equitable was aware of the guidelines. However, the expert makes no mention whatsoever of these factors. He has not found them unreasonable, fundamentally unsound, against the industry standards, or invalid as against public policy. In the Fifth Circuit, the district court may reject the proffered opinion of an expert witness if it is fundamentally unsupported. *Viterbo v. Dow Chemical*

*Co.*, 826 F.2d 420 (5th Cir.1987). Consequently, in the instant case, the offered evidence is insufficient to create a question of fact on the issue of materiality. The opinion on its face is based only upon Longnecker's income which is only one of a multitude of factors to be considered. Therefore, the expert's opinion is fundamentally unsupported in light of *Viterbo*.

The plaintiff's factual argument for reformation is also unsupported by the record. Equitable contends that had the appraisal been correct, it would have loaned a lesser amount, and MGIC would have insured the lesser amount. Equitable bases its position on the master policy, the course of conduct between the parties on other loans, and on Kathy Dearing's deposition. Equitable states that MGIC conceded in the Dearing deposition that had the mistake been known to Equitable and equitable had submitted an application based on the correct square footage and value, then MGIC would have issued its insurance coverage. (Dearing Deposition, p. 80). However, Dearing further testified:

> If that $180,000 were the only liens against the property, there were no other liens and there was $45,000 in pure equity, we may very well have insured it.... [A]ssuming we had a competent value of $225,000, a competently prepared value of $225,000, we would have issued a commitment for insuring total liens and mortgages of $180,000.

MGIC has then pointed out evidence showing Longnecker's indebtedness. Consequently, MGIC has not admitted that it would have insured the lower amount.

Additionally, the plaintiff argues that the course of conduct between these two parties as evidenced by the Master Policy and the accommodation policies indicate the intent of the parties to insure the subject premises, and, therefore, reformation would be applicable. However, the plaintiff has not shown where it was MGIC's practice to insure loans based upon incorrect data. What MGIC does with the true set of facts in one or more situations does not indicate what it might do when it is misled as to the value of the security.

Finally, the plaintiff makes the argument that the general equitable powers of the Court should be exercised to grant relief to the plaintiff. Specifically, Equitable suggests that the general equity powers of the Court would justify having the Court "declare that the Defendant does insure or should insure $54,000 of the subject loan." However, there must be some actionable wrong—not an abstract, non-actionable moral wrong, where, under established principles, some relief is clearly requisite. "[M]odern equity is not authorized to create a substantive judicial right where none ... exists." Griffith, *Mississippi Chancery Practice*, § 35, p. 38 (2d ed. 1950). Although Equitable may think it unfair that it should bear the entire loss on the loan, "[t]he plain mandate of the law cannot be set aside because of considerations which may appeal to [the] referee or judge as falling within general principles of equity jurisprudence." *United States v. Killoren*, 119 F.2d 364, 366 (8th Cir.1941), cert. denied 314 U.S. 640, 62 S.Ct. 78, 86 L.Ed. 513 (1941) (quoting *Southern Bell Telephone & Telegraph Co. v. Caldwell*, 67 F.2d 802, 803 (8th Cir.1933)).

For the above stated reasons, this Court finds that the proper remedy for the situation at hand is rescission of the contract. In that regard, there is no genuine issue of material fact which would preclude this Court from granting judgment to the defendant as a matter of law.[1]

### Conclusion

For the reasons discussed above, this Court finds that the defendant's motion for summary judgment is well-taken and should be granted.

Counsel for defendant shall submit an order in conformity with the foregoing memorandum opinion within ten (10) days of the date of entry hereof.

---

1. The ruling on the liability, of course, moots the claim for punitive damages, and summary judgment on that issue is unnecessary.