# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-01511-SCT

*W. E. WHITE*

*v.*

*GLENN COOKE, DENNIS MASSEY AND STEVE WEEKS*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/03/2007 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY, JR. |
| COURT FROM WHICH APPEALED: | TATE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JAMES W. AMOS |
| ATTORNEYS FOR APPELLEES: | DAVID M. SLOCUM, JR. |
| | JOHN T. LAMAR, JR. |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 01/15/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     William Earl White attended a public auction at which he successfully bid for and contracted to purchase four tracts of land from Glenn Cooke, Dennis Massey, and Steve Weeks (hereinafter collectively referred to as "Cooke"). Prior to closing, a survey revealed that the driveway on a separate property owned by Cooke actually extended onto one of the tracts that White had contracted to purchase. After efforts to reach a compromise with White proved unproductive, Cooke sold this separate property to Roberta Jamison-Ross and granted

her an easement across White's tract. As a result, White filed suit for specific performance of the real-estate contract without the burden of an easement. The chancellor dismissed White's complaint. We affirm the chancellor's denial of specific performance, but reverse and render the award of attorney fees to Cooke.

## FACTS AND PROCEDURAL HISTORY

¶2. On June 5, 2004, John Roebuck and Associates, Inc. (JRA) held a public auction to sell approximately 235 acres in Senatobia, Mississippi. William Earl White successfully bid on four adjacent tracts owned by Cooke. That same day, White executed a real-estate sales contract for these four tracts and paid the buyer's premium of $13,674. The contract described the property as "[t]ract(s) 6, 7, 8, & 9 of the farm land located in [sic] north of Magnolia Lane, Senatobia, Tate County, Mississippi," consisting of about 178.75 acres.

¶3. The auction brochure contained a visual depiction of tracts six, seven, eight, and nine. Beginning with tract six, these properties run consecutively from west to east and lie side-by-side. The brochure also showed two smaller properties, tracts ten and eleven, located within the southernmost part of tract eight. Tracts seven, eight, and nine were shown as having at least 300 feet of frontage, with tract nine having a narrow forty-feet-wide strip of frontage on its southeast portion. The western edge of this strip bordered a driveway on tract ten. This driveway led directly from Magnolia Drive to the home on tract ten, and afforded a means of ingress and egress for the home on tract eleven, as well.

¶4. The contract stated that the final price would "be determined by the actual surveyed acreage times the price per acre," and that title would be conveyed subject to all easements of record. Paragraph five provided that "[a]t closing, settlement and payment of the balance

2

of the purchase price shall be made . . . upon presentation of the Warranty Deed with usual covenants and conveying a good and merchantable title." At the same time, paragraph nine added that the property "SHALL BE CONVEYED AND ACCEPTED in 'As is' condition," with no warranties or representations of any kind other than those expressly stated in the contract.[1] The auction brochure likewise stated that all properties would be sold "'AS IS, WHERE IS, WITH ALL FAULTS' WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND," and subject to right-of-way easements of record. Additionally, the auction catalog included an "As Is /Where Is" disclaimer, and noted that the tracts would be surveyed prior to closing. Closing was set to occur within thirty days at the offices of attorney Barry Bridgforth.

¶5. Following execution of the contract, James Wages conducted a survey and found some discrepancy between the auction brochure and the actual layout of the properties. The driveway, which the brochure placed solely on tract ten, actually extended onto the disputed strip of frontage on tract nine. Upon this discovery, Wages contacted Cooke and explained

---

[1] Paragraph nine specifically stated that:

The property SHALL BE CONVEYED AND ACCEPTED in "As is" condition. Except as expressly set forth in this CONTRACT, neither Seller, nor Seller's agent, nor JRA, has or will make any warranties or representations of any kind or character, expressed or implied, with respect to the Property, including, without limitation, any warranty or representations to the HABITABILITY, DESIGN, QUALITY, MERCHANTABILITY, CONDITION, ENVIRONMENTAL STATUS, MATTERS OF SURVEY OR FITNESS for any particular purpose, all of which are expressly disclaimed. Except for the warranties and representations expressly set forth in this Contract, Buyer is relying solely on its own expertise and information. Buyer has conducted such investigations and inspections of the Property as it deemed necessary and/or appropriate and shall rely upon the same.

that the properties could not be divided according to the representation in the brochure. Cooke directed Wages to meet with White and discuss a potential compromise.

¶6.     Wages proposed that White could either (1) retain the disputed strip subject to an easement for the benefit of tract ten, or (2) exchange the disputed strip for an equal amount of frontage to the west.  White initially agreed to surrender the disputed strip for an equal amount of frontage to the west.  Wages then drafted a second survey that allotted White his full 300 feet of frontage to the west.  Wages, however, later received notice that the parties could not agree on the second survey.[2]  Thereafter, Cooke instructed Wages to prepare a third survey as close as possible to the brochure's description.  Accordingly, Wages drafted a third survey which gave White the disputed strip subject to an easement for the benefit of tract ten.

¶7.     Amid this back-and-forth between White, Cooke, and Wages, Cooke contracted to sell tracts ten and eleven to Roberta Jamison-Ross.  Ross purchased tract eleven, which comprises one and a half acres and includes a home, for $55,000.  Cooke financed the loan for Ross to purchase this property, and then assigned the deed of trust to Senatobia Bank, now known as Sycamore Bank.  The deed to tract eleven was signed on July 20, 2004, and recorded on October 12, 2004.  Tract ten comprises three and a half acres, and includes a home in which Ross now lives. This particular tract sold for $225,000, and was financed by Wells Fargo Bank, N.A.  The deed to tract ten was executed on September 20, 2004, and

---

[2]  The parties dispute how or why the second survey was rejected.  Cooke asserts that White initially agreed to the exchange, but changed his mind days later.  White, on the other hand, contends that he never saw the second survey and never had the chance to accept or reject it.  White claims that he was simply told that the second survey had been rejected.

recorded on September 27, 2004. An essential component of these purchases was Cooke granting Ross an easement across the disputed strip on tract nine.

¶8.     On September 20, 2004, after learning of Ross's easement, White filed a complaint for specific performance of the real-estate contract and a *lis pendens* notice in the Tate County Chancery Court. White asserted that he was entitled to specific performance of the contract in accordance with the representations in the auction brochure, which showed no easements. Cooke filed an answer and counterclaim contending that they were entitled to specific performance of the contract subject to an easement on tract nine. JRA paid to the court the $13,674 buyer's premium and subsequently was discharged from the suit.[3]

¶9.     On July 3, 2007, following a trial, the chancellor issued an opinion and order dismissing White's complaint and Cooke's counterclaim. The chancellor further canceled and released White's *lis pendens* notice. He ordered White to pay Cooke's attorney fees in the sum of $7,730.89. The chancellor entered an amended order on July 18, 2007, clarifying that Cooke's attorney fees were to be paid from the interpleader funds, and that all remaining interpleader funds were to be paid to White. White filed a motion for new trial, which the chancellor denied in an order dated August 30, 2007.

¶10.    White now appeals to this Court raising six assignments of error: (1) the chancellor erred in concluding that the contract afforded Cooke an "escape clause"; (2) the chancellor erred in finding that it was "fair and reasonable" for Cooke to sell tracts ten and eleven to Ross; (3) Cooke failed to act in good faith; (4) the chancellor erred in finding that Cooke

---

[3] White filed an amended complaint on September 15, 2006, joining Ross, Sycamore Bank, and Wells Fargo Bank, N.A., as defendants. Wells Fargo was later dismissed.

5

could not convey the disputed strip as shown in the auction brochure; (5) the chancellor erred in concluding that specific performance could not be granted because closing did not take place within thirty days; and (6) the chancellor erred in awarding attorney fees to Cooke.

¶11.    We consolidate these six assignments of error into the following two issues: (1) whether the chancellor erred in denying White specific performance of the real-estate contract without an easement on tract nine, and (2) whether the chancellor erred in awarding attorney fees to Cooke.

## STANDARD OF REVIEW

¶12.    This Court "will not disturb the factual findings of a chancellor when supported by substantial evidence unless [we] can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard." *Biglane v. Under the Hill Corp.*, 949 So. 2d 9, 13-14 (Miss. 2007) (quoting *Cummings v. Benderman*, 681 So. 2d 97, 100 (Miss. 1996)).

## DISCUSSION

I.    **Whether the chancellor erred in denying White specific performance of the real-estate contract without an easement on tract nine.**

¶13.    White argues that the real-estate contract clearly indicated that the properties were not burdened by an easement, and therefore, he is entitled to specific performance of the contract without the easement on tract nine. He submits that a valid, enforceable contract exists, and that Cooke must convey the property as shown in the auction brochure. He acknowledges that the driveway on tract ten extends onto tract nine, but insists that he is entitled to sole use of this driveway and that Ross has sufficient frontage without the easement. He argues that

6

Cooke acted in bad faith by placing their own financial interests ahead of White's contractual rights in granting Ross the easement and trying to force him to accept this condition.

¶14. For specific performance to be granted, a contract must be reasonably complete and reasonably definite on material terms. *Leach v. Tingle*, 586 So. 2d 799, 802 (Miss. 1991) (citing *Duke v. Whatley*, 580 So. 2d 1267, 1272-74, (Miss. 1991)). "A contract is said to enjoy the level of specificity predicate to enforceability: if it contains matter which will enable the court under proper rules of construction to ascertain its terms, including consideration of the general circumstances of the parties and if necessary relevant extrinsic evidence." *Leach*, 586 So. 2d at 802 (quoting *Duke*, 580 So. 2d at 1274). If the contract does not pass this test of specificity, it should be rendered unenforceable, and specific performance should be denied. *Leach*, 586 So. 2d at 802 (citing *Duke*, 580 So. 2d at 1272-74).

¶15. A contract may be set aside, however, where both parties at the time of the agreement were operating under a mutual mistake of fact. *See*, *e.g.*, *Greer v. Higgins*, 338 So. 2d 1233, 1236 (Miss. 1976) (quoting 17 C.J.S. *Contracts* § 144, p. 894). Such mistake "may apply to the nature of the contract, the identity of the person with whom it is made, or the identity or existence of the subject matter . . . ." *Greer*, 338 So. 2d at 1236 (quoting 17 C.J.S. *Contracts* § 144 at 894). In any event, the mistake must relate to a past or present material fact to relieve a party(s) from liability. *Greer*, 338 So. 2d at 1236 (quoting 17 C.J.S. *Contracts* § 144 at 894).

7

¶16. The chancellor found that "there was a contract to sell land by deed closing within thirty days; however, there was an error in the description." He determined that the "as is" clause within the contract afforded Cooke an "escape clause." He found the forty feet of frontage and the easement to be "vital important facts" to the contract, but stated that Cooke could not convey something that they did not own. He construed the later surveys, which White rejected, as "being in the nature of [] counter-offers." He then dismissed the action, concluding that "there could be no closing within thirty days and there cannot be specific performance of the sale of the property . . . ."

¶17. Our review of the chancellor's opinion leads us to conclude that he denied specific performance because the parties failed to have a "meeting of the minds" on a material term of the contract. Thus, he found that no enforceable contract existed due to a mutual mistake and dismissed the entire action, including Cooke's counterclaim.

¶18. We find that the chancellor did not abuse his discretion in denying specific performance and dismissing the case. At the time of the contract, both parties were laboring under a mistaken belief that the driveway on tract ten did not intrude onto tract nine. The existence of the driveway constituted a material term in that it interfered with White's ability to access the property with his farm equipment[4] and afforded the sole means of ingress and egress to the house on tract ten. Thus, the driveway was an essential term of the contract based on its importance or substantial effect upon each tract. Because the parties were mistaken about a material fact, we find that the chancellor did not abuse his discretion in

___

[4] According to White, the light residential pavement could not hold up under the use of heavy farm equipment. Additionally, trees which lined the driveway would have to be removed.

8

rescinding the contract. *See* ***Greer***, 338 So. 2d at 1236 (conveyance of property was set aside due to a mutual mistake of fact on the part of both of the parties to the contract).[5]

**II.     Whether the chancellor erred in awarding attorney fees to Cooke.**

¶19.    The chancellor awarded attorney fees to Cooke on the basis that White failed to act in good faith after the mistake was discovered. The chancellor found that "by rejecting the additional plats and by filing this action for specific performance, which was denied, White caused damage to Cooke, et al[.] in the nature of attorney fees."

¶20.    We find that White did not act in bad faith and that the chancellor abused his discretion in awarding Cooke attorney fees. In rejecting the additional surveys and filing for specific performance, White merely sought to enforce what he believed he had contracted for—the property without the easement. Had a valid contract been found, White likely would have been entitled to specific performance subject to the easement, with the right to recover damages for breach of contract. *See* ***Whitman v. Larson***, 172 A.D.2d 968, 487, 568 N.Y.S.2d 485 (N.Y. App. Div. 1991) (citing ***Tanners Realty Corp. v. Ruggerio***, 111 A.D.2d 974, 975, 490 N.Y.S.2d 73, 74 (N.Y. App. Div. 1985)).

**CONCLUSION**

---

    [5] White makes much of the fact that Ross filed her deeds containing the easement after he had filed his complaint and *lis pendens* notice. Yet, White's *lis pendens* notice did not prevent the conveyance of the easement. *See* ***Glattli v. Bradford***, 105 Miss. 573, 581, 62 So. 643, 644 (1913). Its only effect was that Ross took the property subject to White's rights as may finally be determined. *See* ***id***. The chancellor ultimately found that White had no interest in the property because the case was dismissed and the *lis pendens* notice was released.

9

¶21.    We affirm the chancellor's dismissal of the action.  However, we reverse and render the award of Cooke's attorney fees.

¶22.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**CARLSON, P.J., RANDOLPH, KITCHENS AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY.  DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY CHANDLER, J.  LAMAR, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, DISSENTING**:

¶23.    Today's majority allows a seller who auctioned several parcels of property in their "as is" condition, to back out of the deal because he now claims he was unaware that one of his parcels had a road on it, and he wants another one of his buyers to have the road.  I disagree with the majority and, therefore, respectfully dissent.

¶24.    The issue here is easily framed, and the facts are essentially undisputed.  The seller contracted to sell, and the buyer contracted to buy, tracts 6, 7, 8 and 9.  The contract bound the seller to convey title "subject to all easements of record" existing at the time the contract was entered.  The contract also stated that the property "SHALL BE CONVEYED AND ACCEPTED in 'as is' condition," with no warranties or representations of any kind other than those expressly stated in the contract.  In my view, "as is" applies to all parties to the contract, and means the property will be conveyed as the title and condition existed at the time the contract was entered, not at the time of closing.  To the majority, the term "as is" applies only to the buyer.

¶25.    The majority cites no authority to support the novel notion that a seller may contract to sell a parcel of property "as is," "subject to easements of record," and then – after

10

contracting, but prior to closing – grant easements to third parties. Indeed, the majority's failure to cite authority is not surprising, as I find such notion unsupported anywhere in the law.

¶26. This case is not about a mutual mistake of fact. A seller who advertises and sells property in its "as is" condition cannot back out of the deal because he later learns the property he contracted to sell has a road on it he thought was on another parcel he wants to sell to someone else. Stated another way: *A person who wants to come back later and correct mistakes shouldn't sell property "as is."* Cooke carefully placed everyone on notice that – regardless of what was in the brochure – the parcels were being sold "as is." Then, after discovering that the "as is" was not as he thought it was (or wanted it to be), he claims mutual mistake of fact. I am quite surprised that the majority is persuaded by this specious argument.

¶27. This case is also not about when Ross filed her deed containing the easement, but rather what Ross knew when she acquired the easement and filed the deed. Mississippi is a race/notice jurisdiction. That is, where an owner conveys conflicting claims to real property, the first to file (wins the "race" to the courthouse) has priority, unless that person takes the interest with "notice" of a prior, conflicting claim. *See* Miss. Code Ann. §§ 89-5-1 through -5. If Ross acquired an easement from Cooke with knowledge – that is, notice – that Cooke had no right to convey the easement because he had already contracted to sell the property to White, subject only to easements of record, then her "race" to the courthouse cannot overcome her notice of White's interest in the property. It seems to me an elementary concept of real property law that an owner cannot encumber property he or she has

11

previously contracted to sell without the encumbrance. And because Mississippi is a race/notice jurisdiction, the encumbrance is not valid if the person taking the interest (in this case, easement) had notice of the prior contract to sell.

¶28. Because I believe that, under the facts of this case, White is entitled to specific performance of the contract, that is, conveyance of the tracts subject only to easements of record, I respectfully dissent.

**CHANDLER, J., JOINS THIS OPINION**.